DAWKINS, J.
Plaintiff applied to the board of parole for the state for a parole (having been sentenced to the penitentiary for life) and the board declined to file or consider the application, for the reason, as it contended, that it had no lawful power to do so. .A petition was then presented to the court below for a writ of mandamus to compel consideration by the board of plaintiff’s application, and that court, on the same ground, declined to issue the writ. An appeal was then sought to this court, and, being denied, mandamus was successfully invoked, and the ruling of the district court is now before us for review. See State ex rel. Paillet v. Board of Parole, 91 South. 759, ante, p. 345.
Opinion.
Plaintiff contends that, while the board may not be compelled to decide his application for parole in any particular way, under section 6, of Act No. 125 of 1916, it is bound to file and pass upon the same.
The Legislature of 1916 passed three companion bills, which were signed and approved on the same day, July 5th, and became respectively Acts Nos. 123, 124, and 125. The first is entitled:
“An act to provide for the imposition of indeterminate sentence upon persons sentenced to imprisonment in the state penitentiary at hard labor otherwise than for life, or persons convicted of treason, arson, rape, attempt to commit rape, crimes against nature, bank and homestead officers misusing funds of the depositors, notaries public who are defaulters, train wreckers, kidnapers and dynamiters.”
It (No. 123) contains only one section, which excludes from the category of those upon whom indeterminate sentences shall be passed, persons convicted of offenses carrying life sentence, etc., and makes it the duty of district judges to sentence all other offenders to an indeterminate sentence, “the minimum of which sentence shall not be less than the minimum term of imprisonment fixed by the statute under which such person shall have been convicted, and the maximum not more than the maximum fixed in such statutes; provided that where no maximum term is fixed in such statute, said minimum term shall be taken and intended as one year.” This statute deals with prisoners thereafter to be sentenced, and it is clear that “life termers” and the other excluded classes mentioned in the above-quoted title cannot be given indeterminate sentences; hence they are denied the benefit of a parole under the third act, No. 125, which we will later consider.
The title of the second act/ (124) reads:
“An act to confer on prisoners now serving terms of imprisonment at hard labor the benefit of an indeterminate sentence.”
The body of this statute makes it the duty of the board of parole (created by the third act, No. 125), within six months after its passage, to “investigate into the conduct of all prisoners who were sentenced to imprisonment at hard labor, otherwise than life, or *723 persons convicted of treason,” etc., and to discharge such of said .prisoners on parole as “in the opinion of the board, merit such discharge: Provided, that at the time of such discharge on parole said prisoners shall have already served not less than two years of their sentence.”
Plainly, this last statute deals exclusively with persons already in the penitentiary at the time of its passage, and contains all of the provisions to be found in any of the acts affecting such classes of prisoners. The body of the law expressly excludes “life termers” from its benefits.
The third act (No. 125) bears the following title:
“An act to establish a mode by which prisoners sentenced to an indeterminate sentence may be paroled and in order, to carry out the provisions of this act to create a board of parole and to define the powers and duties of said board.” (Our italics.)
The first section creates the board and gives it “power to determine when and under what circumstances a prisoner sentenced to an indeterminate sentence shall be paroled.” Section 2 requires it to organize within 30 days and to “adopt a uniform system for the marking of prisoners,” as to credits, etc., “and such other regulations as may be necessary for the carrying out of this act. * * * ” Section 3 provides:
' “That each prisoner sentenced to an indeterminate sentence may, a month prior to the expiration of the minimum term of his sentence, make application to the Board in writing and in such form as the Board may prescribe for his release upon parole; provided that if being suitable to the board, the Board may in any particular case dispense with this rule.” (Our italics.)
Section 4 makes it the duty of the board, “immediately upon the filing of said application, to enter into an investigation of the conduct of said prisoner,” and, if he has, “under the rules and regulations of said board of parole, become entitled to discharge, * * * this board shall order the release of said prisoner * * * at the expiration of the minimum term fixed in the sentence. * * * ”
Section 5 deals with the terms and conditions of the prisoner’s parole, and his reincarceration, if violated.
Section 6 is the one relied upon by appellant as requiring the board to consider his application, and we quote it in full as follows:
“That no parole shall be granted to any convict serving a life sentence until he shall have served at least one-third of the actual time he, would have served if classed as eligible for reduction of sentence under the laws of this state, and in case of ‘life termers,’ the parole must be approved by the board of pardons.”
Section 7 requires that a paroled prisoner be furnished with $5 in money, a suit of clothes, and transportation to whatever point within the state he may choose to go, and section 8 repeals all conflicting legislation, particularly Act No. 149 of 1914, which was the parole law in this state until the passage of the three acts now under consideration.
Under Act 149 of 1914, the Governor, and in his absence, the Lieutenant Governor, was permitted, upon the recommendation of the board of control of the state penitentiary, to parole convicts “serving their first sentence for a felony and who have not been convicted of treason, arson, rape * * * or crimes against nature. * * * ” Therefore life termers were not excluded from the benefits of a parole under that statute, as they are by the Acts Nos. 123 and 124 of 1916. However, the two latter acts, in express terms, deny to life termers and some 10 other classes of offenders the right to a parole; the first, as we have said, dealing with persons convicted after its passage, or the future, and the second with convicts already in the penitentiary 'when it was adopted.
[1,2] The third, or Act No. 125, neither in its title nor body purports to define indetermi *725 nate sentences, or to enumerate the classes of prisoners who are to be paroled. The three acts being concurrent legislation, approved on the same day, and introduced by the same member of the Legislature, are in pari materia, and must be construed together, so as to give effect to all. The first two having defined and classified indeterminate sentences and the offenders entitled to parole, the third creates a board of parole and provides the machinery for making effective such indeterminate sentences. In so far as section 6 attempts, by inference, to add 'life termers to the classes which may be paroled the same is broader than the title of the act, and clearly in conflict with Acts Nos. 123 and 124, by which they are expressly excluded. There is no intimation in the title of a purpose to so enlarge the list of eligibles; and to hold that life termers may be paroled under section 6 of Act No. 125 would have the effect of nullifying the excluding provisions of both the former statutes, notwithstanding the fact that they all became operative simultaneously, and under well-recognized principles of. construction must all be given effect if it is possible to do so. As disclosed by the title, the purpose of the last act was “to establish a mode by which prisoners sentenced to an indeterminate sentence may be paroled,” etc., and not to define indeterminate sentences or to declare who should be eligible.
It is argued by counsel for appellant 'that a sentence to life imprisonment and the credits which are allowable under existing law^s, by which it may be reduced to 15 years or less, constitutes within itself an indeterminate sentence. However, this is contending against the plain provisions of Acts Nos. 123 and 125, which clearly include only cases where the prisoner has been “sentenced to an indeterminate sentence” in which a maximum and minimum have been fixed by the trial court; while Act 124, in giving to persons already in the penitentiary at the time of its passage the benefit of an indeterminate sentence, in so many words excludes life termers. In other words, the authority for paroling prisoners who were serving at hard labor when the laws were passed (among •which class falls the appellant’s case), is Act 124 and by express exclusion it declares that life termers shall not be paroled.
[3] The title to Act No. 124, “to confer on prisoners now serving terms of inprisonment at hard labor the benefit of an indeterminate sentence,” is broad enough to cover all classes of prisoners then in the penitentiary, but the body restricts the title by excluding life termers, etc. This would make no difference, unless the variance between the title and text was such as to make the title misleading in which case the whole statute would fall; but such a result would be equally fatal to appellant’s contention, because there would then be no law under which prisoners sentenced prior to the passage of Act No. 125 could be paroled, since the latter repeals all prior laws in conflict therewith, and specifically Act No. 149 of Í914.
For the reasons assigned, the order and ruling appealed from, denying the mandamus to the board of parole, are affirmed.